# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | | |
|---|---|---|
| RONALD C. RICHARDS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:14-CV-128-TLS |
| | ) | |
| CAROLYN COLVIN, | ) | |
| Acting Commissioner of the Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

The Plaintiff, Ronald C. Richards, seeks review of the final decision of the Commissioner of the Social Security Administration denying his application for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB). On September 30, 2010, the Plaintiff filed applications for SSI and DIB, alleging disability beginning on January 12, 2010. An ALJ held a hearing on April 16, 2012, at which the Plaintiff—who was represented by an attorney—and a vocational expert (VE) both testified. On July 23, 2012, the ALJ found that the Plaintiff has the following severe impairments: bipolar disorder, left acoustic neuroma, and atypical trigeminal neuralgia. However, she ultimately concluded that the Plaintiff is not disabled. The Plaintiff requested review of the ALJ decision, and on October 31, 2013, the Appeals Council denied the Plaintiff's request for review. On April 22, 2014, the Plaintiff initiated this civil action for judicial review of the Commissioner's final decision.

## BACKGROUND

A.  **Plaintiff's Testimony**

The Plaintiff is 55 years old and lives with his fiancée and her three children. He has a General Education Diploma (GED), and his past relevant work is as a production assembler, a grinder, and a forklift operator.

At the ALJ hearing on April 16, 2012, the Plaintiff described his daily experience with several alleged physical and mental impairments. As to his physical impairments, the Plaintiff said he has a tumor on the left side of his head that causes him to suffer daily headaches. According to the Plaintiff, the headaches cause vision loss that occurs, on average, every other month.[1] The Plaintiff also said he suffers from hearing loss, but he no longer wears his hearing aids due to vibrations caused by his tumor.

The Plaintiff also testified that he suffers from seizures, which typically last four to six hours at a time. The Plaintiff described the seizures as follows:

> [Prior to having a seizure,] I'll be standing up, [and] the next thing you know . . . everything just goes out, like the lights went out. But I'm still awake and . . . well, I can't function. I can't move. . . . I have had [seizures] that lasted over eight hours, where I just lay down and do nothing. I may drool a little bit out of the left side of my mouth or something . . . but I just lay there. I can hear, but I can't speak and I can't see [anything].

(R. 47–48.) The Plaintiff said he treats his seizures with medication, including Carbamazepine. He also takes medication for pain in his back and left jaw. According to the Plaintiff, such medications cause him to suffer fatigue.

As to his mental impairments, the Plaintiff said he does not like crowds of people, and

---

[1]The Plaintiff estimated that he suffered vision loss 14 times since January 2010.

therefore, rarely goes out in public. The Plaintiff also described symptoms of rapid mood swings, anxiety, memory loss, unexplained anger, and feelings of paranoia. The Plaintiff testified that, due to his depression, he sometimes goes days (or even up to a week) without getting dressed or taking a shower.

The Plaintiff testified to performing limited chores around the house (i.e., washing dishes for no more than 20 minutes at a time) and driving short distances occasionally (i.e., three-and-a-half blocks from his house). When asked to describe his typical day, the Plaintiff said he spends his day alternating between sitting, standing, and laying down. He said he cannot sit for more than 30 minutes at a time, and can only walk one block before stopping.

During his testimony, the Plaintiff also acknowledged his history of alcohol and illegal drug abuse. According to the Plaintiff, he currently drinks alcohol once per week and has not used illegal drugs for nearly 11 years. The Plaintiff said he no longer attends AA meetings because of his "mood swings." (R. 58.)

### B.    Vocational Expert's Testimony

At the hearing, the vocational expert (VE) testified that an individual of the Plaintiff's age, education, and work experience who was limited to a work setting (1) that does not have more than moderate noise; (2) that does not require protective hearing devices; (3) where all communications are non-essential to work; and (4) does not require highly acute hearing, could not perform any of the Plaintiff's past relevant work. However, the VE opined that such an individual, even with additional requirements (i.e., the ability to sit or stand at will, avoid the general public, and have only brief and superficial contact with co-workers and supervisors)

could perform light exertional work as an electrical accessories assembler, laundry folder, and an electronics worker; or sedentary work as an addresser or document copier. The VE stated that, typically, an individual who consistently misses two to three days of work per month, or twelve or more days of work per year, cannot maintain employment.

**C.     ALJ Decision (Five-Step Evaluation)**

The Social Security regulations set forth a five-step sequential evaluation process to be used in determining whether the claimant has established a disability. *See* 20 C.F.R. § 404.1520(a)(4)(i)-(v); 42 U.S.C. § 423(d)(1)(A) (defining a disability under the Social Security Act as being unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."); § 423(d)(2)(A) (an applicant must show that his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.") The first step is to determine whether the claimant is presently engaged in substantial gainful activity (SGA). Here, the ALJ found that the Plaintiff was not engaged in SGA, so she moved on to the second step, which is to determine whether the claimant had a "severe" impairment or combination of impairments. An impairment is "severe" if it significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a). The ALJ determined that the Plaintiff's severe impairments are bipolar disorder, left acoustic neuroma, and atypical trigeminal neuralgia.

At step three, the ALJ concluded that the Plaintiff did not have an impairment, or combination of impairments that meets or medically equals the severity of one of the impairments listed by the Administration as being so severe that it presumptively precludes SGA. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1.

Because the Plaintiff's impairment was found not to meet or equal a listed impairment, the ALJ was required, at step four, to determine the Plaintiff's residual functional capacity (RFC). RFC is an assessment of the claimant's ability to perform sustained work-related physical and mental activities in light of his impairments. SSR 96–8p. The relevant mental work activities include understanding, remembering, and carrying out instructions; responding appropriately to supervision and co-workers; and handling work pressures in a work setting. 20 C.F.R. § 404.1545(c). The ALJ concluded that the Plaintiff had the RFC to perform a limited range of light work; or more specifically, light work that allows him to alternate between sitting and standing. However, the ALJ found that, due to the Plaintiff's non-exertional limitations, he could only perform work that (1) does not expose him to more than a moderate level of noise or where it is the standard business practice that all workers wear protective hearing equipment; (2) does not require oral communication as an essential element of the work; and (3) does not require highly acute hearing. Additionally, the Plaintiff cannot interact with the general public, and can only interact with co-workers and supervisors on a brief and superficial basis.

At the final step of the evaluation, the ALJ determined that, in light of the Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that he could perform.

**STANDARD OF REVIEW**

The decision of the ALJ is the final decision of the Commissioner when the Appeals Council denies a request for review. *Liskowitz v. Astrue*, 559 F.3d 736, 739 (7th Cir. 2009). A court will affirm the Commissioner's findings of fact and denial of disability benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Even if "reasonable minds could differ" about the disability status of the claimant, the court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

It is the duty of the ALJ to weigh the evidence, resolve material conflicts, make independent findings of fact, and dispose of the case accordingly. *Perales*, 402 U.S. at 399–400. In this substantial-evidence determination, the court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Nevertheless, the court conducts a "critical review of the evidence" before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an inadequate discussion of the issues. *Id.*

The ALJ is not required to address every piece of evidence or testimony presented, but the ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). If the Commissioner commits an error of law, remand

is warranted without regard to the volume of evidence in support of the factual findings. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

## ANALYSIS

On appeal, the Plaintiff contends that, in determining his RFC, the ALJ (1) failed to provide sufficient reasons for not giving controlling weight to the opinions of the Plaintiff's treating physicians, Drs. Vijoy K. Varma (psychiatrist) and Beulah Penumudi (family medicine physician); and (2) improperly discredited his testimony about his functional limitations. The Court will address each issue in turn.

### A.     Opinions of Treating Physicians

An ALJ is tasked with evaluating opinion evidence when making a determination of disability. A treating physician's opinion is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. 20 C.F.R. § 404.1527(c)(2). An ALJ must offer good reasons for discounting a treating physician's opinion. *Id.* Even when the treating physician's opinion does not deserve "controlling weight," the ALJ must consider certain factors—namely, (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) how supportable the doctor's medical opinion is; (4) how consistent the doctor's opinion is with the record; (5) the doctor's specialization; and (6) other factors that might support or contradict the doctor's opinion—to determine what weight to give the opinion. *Id.* The ALJ must give "good reasons" to support the weight he ultimately assigns to the treating

7

physician's opinion. § 404.1527(c).

**1.**     *Dr. Varma*

Dr. Varma, a board certified psychiatrist, has treated the Plaintiff continuously since 2011. Dr. Varma's notes from the initial evaluation on April 5, 2011, indicate that the Plaintiff described feelings of stress (due to his inability to work); impatience; anxiety; and a lack of motivation, interest, or happiness in his daily life. The Plaintiff also described mood swings, insomnia, and agoraphobia. Following the evaluation, Dr. Varma diagnosed the Plaintiff with bipolar disorder, major depressive disorder (single episode, severe without psychotic symptoms), and personality disorder. Dr. Varma prescribed Celexa (treats depression), Abilify (treats depression and bipolar disorder), and increased the Plaintiff's dose of Ambien (treats insomnia). At the time of his initial evaluation, the Plaintiff was also taking trazadone (treats depression).[2]

In a psychiatric/psychological impairment questionnaire, dated February 6, 2012, Dr. Varma opined that the Plaintiff is "markedly limited" in his ability to maintain attention and concentration for extended periods; complete a normal work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and set realistic goals or make plans independently. (R. 935–37.) Dr. Varma also opined that the Plaintiff is "moderately limited" in his ability to

---

[2]Dr. Varma's notes indicate that the Plaintiff's prescribed medications fluctuated throughout his treatment. In August 2011, Dr. Varma prescribed Lamictal (treats bipolar disorder) to replace Tegretol and Ambien, and discontinued the Plaintiff's prescription of Abilify and Celexa. Then, in December 2011, Dr. Varma increased the Plaintiff's prescription of Lamictal and resumed his prescription for Abilify. And in February 2012, Dr. Varma discontinued Lamictal and Abilify and prescribed Carbamazepine (treats bipolar disorder). The record shows that such changes were prompted, in large part, by the Plaintiff's documented complaints as to their effectiveness and/or adverse side-effects.

understand, remember, and carry out detailed instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance; work in coordination with or proximity to others without being distracted; interact appropriately with the general public; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting. (*Id.*) He noted that the Plaintiff's impairments are "likely to produce 'good days' and 'bad days'," and estimated that the Plaintiff is likely to be absent more than three times per month as a result of his impairments or treatment. (*Id.* at 938–39.) Dr. Varma also gave the Plaintiff a global assessment of functioning (GAF) score of 45, which reflects a person with "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *See Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* 34 (Text Revision, 4th ed. 2000).

In her decision, the ALJ determined that Dr. Varma's opinion "is not entitled to even great weight" (R. 34), in part, because Dr. Varma failed to provide a sufficient explanation. *See* 20 C.F.R. § 404.1527(c)(3) ("The better an explanation a source provides for an opinion, the more weight we will give that opinion."); *but cf. id.* ("[B]ecause *nonexamining sources* have no examining or treating relationship with [the claimant], the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions.") (emphasis added). In particular, the ALJ noted that Dr. Varma failed to provide a narrative explanation for the psychiatric/psychological impairment questionnaire, which mirrors the mental residual functional capacity assessment (MRFCA) form used by state agency psychologists to record summary conclusions. *See Klahn v. Colvin*, No. 13-C-165, 2014 WL 841523, at *19 (E.D. Wis. Mar. 4, 2014) ("the boxes checked in the Summary Conclusions

9

section of the MRFCA form are not intended as mental RFC findings."). The ALJ also noted that, prior to seeing Dr. Varma, the Plaintiff's treatment "consisted of counseling for chemical dependency." (R. 34.)[3]

More notably, however, the ALJ's determination was based, in part, on her conclusion that Dr. Varma's treatment records are "inconsistent with his assessment of marked limitations." (R. 34.) While acknowledging that the Plaintiff's GAF score of 45 reflects a "serious impairment in social, occupational, or school functioning" (R. 35), the ALJ described Dr. Varma's notes and found that the Plaintiff was "frequently non-compliant" with his treatment.

> At his August 2011 follow-up [with Dr. Varma] the [Plaintiff] . . . presented as neatly and casually dressed [but] was hurried with pressured speech. He was cooperative, denied anger, and seemed in good control of his impulses. Thought processes were logical and organized and speech coherent and relevant. He was fully oriented with estimated average intelligence and fair insight. Medication changes were made and GAF was unchanged. When he was seen for individual chemical dependency counseling . . . that same month, he had a good mood and appropriate affect and reported that he was sober and enjoying his family and going fishing.
>
> At [the] October 2011 follow-up, [the Plaintiff] reported his mood as up and down and being sort of happy and sad. Mental status and GAF were unchanged. The [Plaintiff] reported feeling terrible in December 2011. However, he had been out of his medications for two weeks, with Dr. Varma noting that it was not clear why. Mental status was relatively the same with the [Plaintiff] presenting as angry and critical. He reported being pissed off and irritable in January 2012, but also reported that he ran out of his medications ten days ago and was drinking a twelve

---

[3]Throughout the ALJ's decision, she refers to evidence of the Plaintiff's "drug seeking behavior." (R. 32.) The ALJ placed particular emphasis on Dr. Penumudi's treatment note, dated March 17, 2011, in which Dr. Penumudi indicated that, due to the Plaintiff's diagnosis of hepatitis C, she declined to prescribe vicodin for the Plaintiff's jaw pain; and instead, prescribed fentanyl. According to Dr. Penumudi, the Plaintiff "got very angry, yelled at me, and walked out of the room" (R. 534), which, in turn, prompted her to recommend a psychiatry consultation due to the Plaintiff's anger issues and "drug seeking behavior." (R. 535). Subsequent to her psychiatric referral, Dr. Penumudi opined in a letter, dated March 7, 2012, that the Plaintiff's "use of drugs and/or alcohol has led to an organic condition that is irreversible regardless of whether the [Plaintiff] continued to use or abstained from drug and/or alcohol use." (R. 941.)

10

> pack a week. In February 2012, the [Plaintiff] reported [that] he felt terrible, abilify made him very sick and mean so he stopped it, and [that he] resumed carbamazepine from [an] earlier supply. Mental status was relatively the same and GAF was unchanged at 45.

(R. 34–35 (citation omitted).) Through the above descriptions of Dr. Varma's treatment records, the ALJ suggests that, but for the Plaintiff's non-compliance with his prescribed medications, his psychiatric symptoms were controlled.

Although the "[social security] regulations expressly permit the ALJ to consider a claimant's treatment history," *Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009), including the claimant's compliance with his physician's treatment recommendations, *see Schmidt v. Astrue*, 496 F.3d 833, 844 (7th Cir. 2007), the ALJ's discussion of the Plaintiff's treatment history for psychological symptoms does not create a "logical bridge" between the evidence and the conclusion. *Terry*, 580 F.3d at 475. In particular, the ALJ does not adequately account for the nature of bipolar disorder (which the ALJ deemed a "severe impairment") and its impact on the Plaintiff's compliance with his prescribed medication regimen.

> A person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days; that is true of the plaintiff in this case. Suppose that half the time she is well enough that she could work, and half the time she is not. Then she could not hold down a full-time job. *E.g., Watson v. Barnhart*, 288 F.3d 212, 217–18 (5th Cir. 2002); *Washington v. Shalala*, 37 F.3d 1437, 1442–43 (10th Cir. 1994). That is likely to be the situation of a person who has bipolar disorder that responds erratically to treatment. Ronald C. Kessler et al., "The Prevalence and Effects of Mood Disorders on Work Performance in a Nationally Representative Sample of U.S. Workers," 163 Am. J. Psychiatry 1561–68 (2006).

*Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008); *see also Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2011) (noting that bipolar disorder "is by nature episodic and admits to regular fluctuations even under proper treatment," and concluding that the ALJ "must consider possible

11

alternative explanations" for the plaintiff's non-compliance with prescribed medications); *Martinez v. Astrue*, 630 F.3d 693, 697 (7th Cir. 2011) (finding that the ALJ "ignored the fact that during manic spells [resulting from the Plaintiff's severe depression, the Plaintiff] had stopped taking her medications," while noting that "people with serious psychiatric problems are often incapable of taking their prescribed medications consistently") (citing *Spiva v. Astrue*, 628 F.3d 346, 351 (7th Cir. 2010) (finding that the ALJ's reference to the Plaintiff's failure to take his medications "ignores one of the most serious problems in the treatment of mental illness—the difficulty of keeping patients on their medications.")).

Similar to the cases cited above, the record shows that the Plaintiff's prescribed medications fluctuated throughout his treatment, in large part, due to the Plaintiff's documented complaints as to the effectiveness and/or side-effects of such medications. *See, e.g.*, Dr. Varma's Notes, Aug. 29, 2011, R. 757 ("[the Plaintiff] said . . . medicines were not good. Took it only for a day. Was bouncing off the wall. Could not sleep. Trazadone not working."); Dr. Varma's Notes, Dec. 20, 2011, R. 1008 ("[the Plaintiff c]omplained a lot about the meds and his condition."); Dr. Varma's Notes, Feb. 28, 2012, R. 976 ("[the Plaintiff said] Abilify made him very sick. Became mean. Stopped it. Has resumed Carbamazepine from earlier supply."); Dr. Penumudi's Notes, Apr. 19, 2011, R. 777 ("[the Plaintiff] is not taking [prescribed psychiatric medications] because they make him have weird nightmares."); *see also* Pl.'s Test., R. 55 (stating that his bipolar disorder causes "mood swings [that] switch so quick . . . that's why [my doctors are] trying to get me on a steady medication, but they can't find which one's working for

me. They've changed my medication three to four times already").[4]

Accordingly, on remand, the ALJ must provide an adequate discussion of the evidence related to the Plaintiff's bipolar disorder (and the Plaintiff's other relevant psychiatric conditions), while clearly articulating how she factored such evidence when discounting the opinion of Dr. Varma. In particular, the ALJ must consider possible alternative explanations for the Plaintiff's non-compliance with his medication regimen. And if applicable, the ALJ must also provide additional discussion as to how relevant employment accommodations—no interaction with the general public, and only brief and superficial interaction with co-workers and supervisors—allow the Plaintiff to engage in substantial gainful work, despite the Plaintiff's documented psychological symptoms.

## 2. *Dr. Penumudi*

The Plaintiff also argues that the ALJ failed to provide sufficient reasons for not giving controlling weight to the opinion of Dr. Penumudi, the Plaintiff's treating family medicine physician.

On March 22, 2012, Dr. Penumudi completed a Multiple Impairment Questionnaire, in which she diagnosed the Plaintiff with "dental disorder," "facial pain," and "vestibular disease." (R. 1042.) She also opined that in an eight-hour workday, the Plaintiff was able to sit for 30

---

[4]The Court acknowledges that the ALJ's determination as to whether Dr. Varma's opinion is entitled to controlling weight may collapse into the ALJ's determination as to whether the Plaintiff's statements regarding his psychiatric symptoms are credible. *See Schaaf v. Astrue*, 602 F.3d 869, 876 (7th Cir. 2010) (ALJ gave little weight to treating physician's opinion because he also discredited claimant's testimony). But here, the ALJ provides no indication that the Plaintiff's credibility (or lack thereof) was a consideration in her analysis of Dr. Varma's opinion.

13

minutes at a time, stand/walk for two to three hours total, and occasionally lift/carry up to 10 pounds. According to Dr. Penumudi, the Plaintiff's physical impairments "constantly" interfered with his attention and concentration. (R. 1047.) She opined that the Plaintiff would need to take unscheduled breaks (15-20 minutes) every hour; and that the Plaintiff would likely be absent more than three times per month due to his limitations and/or treatment. The ALJ found that Dr. Penumudi's opinion was entitled to "little weight" because it is inconsistent with other opinion evidence in the record—namely, the opinions of Phillip Galeon (physical therapist), Dr. Tariq Sami (internist), and Dr. H.M. Bacchus (family practicitioner)—and is unsupported by the record. (R. 31.)

The Plaintiff asserts that the ALJ committed legal error by not explicitly addressing the checklist of factors under 20 C.F.R. § 404.1527(c)(2)–(6) in considering Dr. Penumudi's opinion. While "[i]t is true that [§ 404.1527(c)(2)] requires the ALJ to consider those six factors, [a] decision need only include 'good reasons' for the weight given to the treating source's opinion rather than 'an exhaustive factor-by-factor analysis.'" *Hanson v. Astrue*, No. 10-C-0684, 2011 WL 1356946, at *12 (E.D. Wis. Apr. 9, 2011) (quoting *Francis v. Comm'r Soc. Sec. Admin.*, No. 09-6263, 2011 WL 915719, at *3 (6th Cir. Mar. 16, 2011)). "Rather, the ALJ must sufficiently articulate her assessment of the evidence to assure the court that she considered the important evidence and to enable the court to trace the path of her reasoning." *Brown v. Barnhart*, 298 F. Supp. 2d 773, 792 (E.D. Wis. Jan. 26, 2004) (citations omitted).

Here, the ALJ generally covered the ground of § 404.1527(c)(2), while placing particular emphasis on several inconsistencies between Dr. Penumudi's opinion and other opinion evidence. *See Schaaf*, 602 F.3d at 875 (finding that inconsistencies with other evidence may

14

provide good cause to deny controlling weight to a treating physician's opinion, provided that the ALJ adequately articulates the reasoning for discounting the opinion); *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) (same). The ALJ noted that both Galeon and Dr. Sami assessed the Plaintiff as having the ability to sit continuously; keep his head/neck in a static position; concentrate on tasks; follow instructions; maintain motivation; make decisions; and solve problems. The ALJ also noted that Dr. Bacchus, who performed a consultative examination of the Plaintiff, opined that the Plaintiff was capable of not only sitting continuously, but standing/walking occasionally, and frequently balancing and reaching; and that Drs. M. Brill and Fernando Montoya (internal medicine physicians) determined that the Plaintiff's capacities for sitting, standing/walking, and lifting/carrying were not limited. The ALJ also cited evidence showing that the Plaintiff's "extensive treatment for pain . . . has generally been for left sided jaw and/or facial pain," and that specific treatment for back pain "has been very limited." (R. 31.) In sum, the ALJ has sufficiently articulated her rationale for discounting Dr. Penumudi's opinion as to the Plaintiff's physical limitations.

Notwithstanding, overlap exists between the opinions of Drs. Penumudi and Dr. Varma as to the Plaintiff's mental limitations (e.g., the Plaintiff's ability to maintain attention and concentration, or complete a normal workweek without interruptions). In fact, Dr. Penumudi based her opinion, in part, on her finding that the Plaintiff's depression contributed to the severity of his symptoms and functional limitations. Therefore, in light of the Court's determination that remand is appropriate for a fuller discussion as to whether Dr. Varma's opinion is entitled to controlling weight, the ALJ is encouraged—for the sake of completeness—to analyze Dr. Penumudi's opinion in relation to Dr. Varma's opinion (i.e., that

15

the Plaintiff is markedly limited in his ability to maintain attention and concentration for extended periods; complete a normal work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods) and any other relevant evidence that supports Dr. Varma's conclusions.

**B.     Credibility Determination**

Lastly, an ALJ is in the best position to determine the credibility of witnesses, and a credibility determination will be overturned only if it is patently wrong. *Craft*, 539 F.3d at 678; *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) ("Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed."). The ALJ's "unique position to observe a witness" entitles his opinion to great deference. *Nelson v. Apfel*, 131 F.3d 1228, 1237 (7th Cir. 1997); *see also Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006). However, if the ALJ does not make explicit findings and does not explain them "in a way that affords meaningful review," the ALJ's credibility determination is not entitled to deference. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). To evaluate credibility, an ALJ must "consider the entire case record and give specific reasons for the weight given to the individual's statements." SSR 96-7p. The ALJ should look to a number of factors to determine credibility, such as the objective medical evidence, the claimant's daily activities, allegations of pain, aggravating factors, types of treatment received and medication taken, and functional limitations. *Simila*, 573 F.3d at 517 (citing 20 C.F.R. § 404.1529(c)(2)–(4) and *Prochaska*, 454 F.3d at 738).

The ALJ determined that the Plaintiff's testimony—particularly as it relates to his alleged

16

seizures, daily headaches, and fatigue due to his medications—is not fully credible. As to the Plaintiff's alleged seizures, the ALJ analyzed the case record and concluded that such a condition is largely "undocumented by the medical evidence." (R. 27.) The ALJ specifically pointed to several treatment records from 2010 to 2012 showing that, although the Plaintiff was prescribed carbamazepine—a drug that may be prescribed to treat seizures—the drug was intended to treat the Plaintiff's bipolar disorder and neuralgia. As the ALJ notes, even the Plaintiff's attorney acknowledged in a post-hearing brief that "any seizure disorder is poorly documented." (R. 28.) The ALJ also found that the Plaintiff's allegations of headaches and fatigue were not credible, citing, in part, the Plaintiff's claim at an April 2011 appointment that carbamazepine—which, at the time, the Plaintiff had been taking for nine months—controlled his jaw pain and did not cause any ill physical effects (including fatigue); along with medical records showing a lack of any complaints of headaches until November 16, 2011. The ALJ noted that the Plaintiff went on to deny headaches during medical appointments on December 9, 2011, March 7, 2012, and March 22, 2012.

In his brief, the Plaintiff does not appear to challenge the ALJ's credibility determination regarding his alleged seizures, daily headaches, and fatigue; but instead, argues that the ALJ gave this testimony "undue consideration," particularly in light of the Plaintiff's "chronic pain and psychiatric impairments." (Pl.'s Br. 21.)

By and large, the ALJ provided an adequate discussion as to why the Plaintiff's testimony regarding his physical limitations was not deemed credible. In determining that "[t]he evidence reflects extensive treatment for pain, but [that] it has generally been for left-jaw and/or facial pain" (R. 31), the ALJ considered the evidence related to the Plaintiff's back pain, and

17

noted his minimal treatment and largely normal exams. The ALJ also cited evidence suggesting that the Plaintiff's complaints of jaw pain were due to dental problems that the Plaintiff failed to address; along with multiple examinations showing that, contrary to the Plaintiff's testimony, he was not in acute distress.

But here again, a more developed discussion is necessary as to the Plaintiff's psychiatric symptoms. In finding that the Plaintiff's testimony regarding his psychiatric symptoms was not fully credible, the ALJ's appears to rely (almost exclusively) on statements made by the Plaintiff and his fiancée as to the Plaintiff's daily activities. *See* R. 25 (at step three of her analysis, the ALJ discussed several of the Plaintiff's reported daily activities and concluded that although the Plaintiff has "some difficulties with social functioning, they are not marked.") While the ALJ need not provide "an exhaustive factor-by-factor analysis" of the checklist of factors under § 404.1527(c)(2), *Francis*, 2011 WL 915719, at *3, the ALJ must nevertheless afford the Court meaningful review by discussing other factors—aside from the Plaintiff's daily activities—that may serve as a sufficient basis for her determination that the Plaintiff's testimony as to his psychological symptoms was not fully credible.

## CONCLUSION

For the reasons stated above, the decision of the ALJ is REVERSED and REMANDED for proceedings consistent with this Opinion.

SO ORDERED on January 27, 2016.

                     s/ Theresa L. Springmann
                     THERESA L. SPRINGMANN
                     UNITED STATES DISTRICT COURT